UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| BRADLEY TOMEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:20-cv-00323-JMS-MJD |
| | ) | |
| NAVEEN RAJOLI, | ) | |
| SAMUEL BYRD, | ) | |
| WEXFORD OF INDIANA LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Bradley Tomey, an Indiana prisoner, is suing Dr. Naveen Rajoli, Dr. Samuel Byrd, and their employer Wexford of Indiana, LLC for deliberate indifference to a serious medical need.

Mr. Tomey suffers from chronic obstructive pulmonary disease and other chronic medical conditions. In February 2019, he reported worsening respiratory symptoms but was not allowed see a physician for more than six weeks. He developed pneumonia, chest pains, kidney pains, and difficulty urinating. As his condition declined, he was not admitted to the prison infirmary or transported to an outside hospital for several days, despite needing supplemental oxygen, reporting that he was "hungry for air," and hallucinating. When he was finally taken to an outside hospital, he had severe respiratory distress requiring intubation, pneumonia, influenza, severe renal failure, tachycardiac atrial fibrillation, hypokalemia, and severe sepsis. He was on a ventilator for several days and could not speak. He pulled through and was released from the hospital ten days later.

The defendants have moved for summary judgment, arguing that Mr. Tomey did not have an objectively serious medical condition, that they were not subjectively deliberately indifferent, and that Wexford did not have a policy or practice of providing inadequate care to save costs. As explained below, the defendants' motion for summary judgment is **DENIED**.

1

# I. SUMMARY JUDGMENT STANDARD

Parties in a civil dispute may move for summary judgment, which is a way of resolving a case short of a trial. *See* Fed. R. Civ. P. 56(a). Summary judgment is appropriate when there is no genuine dispute as to any of the material facts, and the moving party is entitled to judgment as a matter of law. *Id.*; *Pack v. Middlebury Comm. Sch.*, 990 F.3d 1013, 1017 (7th Cir. 2021). A "genuine dispute" exists when a reasonable factfinder could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those that might affect the outcome of the suit. *Id.*

When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572-73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court is only required to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it is not required to "scour every inch of the record" for evidence that is potentially relevant. *Grant v. Tr. of Ind. Univ.*, 870 F.3d 562, 573-74 (7th Cir. 2017).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

## II. FACTUAL BACKGROUND

### A.  Claims, Parties, and Chronic Medical Conditions

This lawsuit alleges that Dr. Byrd and Dr. Rajoli failed to provide Mr. Tomey with adequate medical care from February 2019 to April 2019, culminating in his emergency transport to Terre Haute Regional Hospital on April 8, 2019. *See generally* dkt. 16 (amended complaint). During that time, Mr. Tomey was incarcerated at Wabash Valley Correctional Facility. Dkt. 85-1 at 16-17. Dr. Rajoli and Dr. Byrd were employed by Wexford of Indiana, LLC, which contracted to provide medical services to prisoners incarcerated at the Indiana Department of Correction. Dkt. 85-5 at ¶ 4; dkt. 99 at 179-204.

In 2019, Mr. Tomey was 48 years old and suffered from at least four chronic medical conditions: chronic obstructive pulmonary disease ("COPD"); non-Hodgkin's lymphoma, which was in remission following chemotherapy; hypothyroidism; and irritable bowel syndrome. *See* dkt. 85-1 at 42; dkt. 85-4 at 3-5; dkt. 99 at 92. Because of these conditions, Mr. Tomey had medical appointments through the prison's chronic care clinic. Dkt. 85-4 at 3-5.

### B.  Request for Health Care – February 11, 2019

On February 11, 2019, Mr. Tomey submitted a Request for Health Care form complaining of worsening respiratory distress:

> I have still consistently had and am having the green mucus come up. I have shown you, Nurse Riggs, and literally had it come up in a chronic care appt. with Dr. Byrd. Now, not only the mucus, but hardened pieces, like you would get off a scab. This cough and green stuff has been going on for well over 1 ½ to 2 yrs. Something needs done. Thank you.

Dkt. 85-1 at 141.

Mr. Tomey received a response on March 19, 2019, when a member of the medical staff wrote, "PFT scheduled" on this form. *Id.* The term "PFT" refers to a pulmonary function test, which "measures lung volume, capacity, rates of flow and gas exchange." Dkt. 85-2 at 15-16.

### C.  PFT and Spirometer – March 21, 2019

On March 21, 2019, Mr. Tomey's PFT was performed using a spirometer. Dkt. 85-4. A spirometer is a diagnostic device that measures the amount of air the patient can breathe in and out. *See* https://www.mayoclinic.org/tests-procedures/spirometry/about/pac-20385201. It requires the patient to take deep breaths in and out of a tube that is attached to a machine for several seconds. *Id.* The test may be used to diagnose a patient with COPD or to check on how well the patient's medication is managing this condition. *Id.*

The parties dispute whether the spirometer Mr. Tomey used on March 21, 2019, was capable of providing reliable results. Mr. Tomey argues that to provide reliable results, a spirometer must be calibrated "prior to each clinic/session or after every 10 patients, whatever comes first." Dkt. 98 at 14. In reply, the defendants note that Mr. Tomey is not a medical professional and does not know how often a spirometer should be calibrated. Dkt. 105 at 8 (citing dkt. 85-1 at 48-49, 51). The defendants have not provided any evidence of their own showing that the spirometer used on March 21, 2019, was capable of providing reliable results or indicating how often a spirometer must be calibrated or checked for accuracy. According to a scholarly article on the National Library of Medicine's website, "[t]he calibration of the spirometer has to be confirmed on the day of the test." https://www.ncbi.nlm.nih.gov/books/NBK560526/.

Mr. Tomey's PFT results show the dates when the spirometer was last calibrated and checked for accuracy. The last time this spirometer (Serial No. 27720) had been calibrated prior

to the PFT was about six years earlier on February 6, 2013, and the last time it had been checked for accuracy was about two months earlier on January 24, 2019:



Dkt. 85-4 at 2 (emphasis added).

By contrast, when the same spirometer was used on October 3, 2019, it had been calibrated on April 25, 2019, and was checked for accuracy on the same day as the exam:



Dkt. 99 at 116 (emphasis added).

Dr. Byrd believes that Mr. Tomey's PFT on March 21, 2019, showed "normal pulmonary functions," and he relied on the results of this PFT during later treatment decisions. Dkt. 107 at ¶¶ 15-16 (Corrected Byrd Affidavit). His corrected affidavit does not comment on whether the spirometer was capable of providing reliable results on March 21, 2019. *See generally* dkt. 107.

### D.  Appointment with Dr. Rajoli – March 27, 2019

Mr. Tomey had a chronic care appointment with Dr. Rajoli on March 27, 2019. Dkt. 85-4 at 3-6 (medical record); dkt. 99 at pp. 4-5, ¶¶ 3-7 (Tomey affidavit). Mr. Tomey was visibly struggling to breathe normally during this appointment, and Dr. Rajoli stated, "I can see you are having breathing issues, Mr. Tomey." *Id.* at p. 5, ¶ 7. Mr. Tomey told Dr. Rajoli that he was coughing up green chunky mucus, was having trouble breathing, was having chest pain, and was having lower back pain. Dkt. 99 at p. 5, ¶ 5. When Mr. Tomey asked Dr. Rajoli about the accuracy of the spirometer used to conduct the PFT, Dr. Rajoli said, "Shut up. I ask the questions, not you." *Id.* at pp. 4-5, ¶ 4. After that exchange, Dr. Rajoli refused to discuss any of Mr. Tomey's symptoms or issues that he was experiencing and kept cutting Mr. Tomey off before he could explain any of the issues in detail. *Id.*

Dr. Rajoli did not perform a physical examination, listen to Mr. Tomey's lungs, or discuss the possibility of using Claritin to manage the production of green mucus. *Id.*[1]

### E.  Appointment with Dr. Byrd – April 5, 2019

After the appointment with Dr. Rajoli, Mr. Tomey's condition continued to deteriorate. Dkt. 16 at 7. On April 5, Mr. Tomey stopped Dr. Byrd in the hallway and said he was having chest pain, flank pain, trouble urinating, severe difficulty breathing, profuse sweating, fatigue, nausea, and more diarrhea than usual. Dkt. 85-4 at 10; dkt. 99 at ¶ 8.

---

[1] Mr. Tomey's account of this medical appointment, as set forth in his affidavit, is at odds with the medical record completed by Dr. Rajoli. The medical record states that Dr. Rajoli, "[r]eviewed his medications and addressed his rescue inhaler for symptom relief, advised otc Claritin for allergy symptoms. Further management as per the clinical course of the patient." Dkt. 85-4 at 3. Dr. Rajoli indicated that he performed a physical exam of Mr. Tomey and that all the findings were "Normal." *Id.* at 5. Because Mr. Tomey is the non-moving party, the Court construes this factual dispute in his favor and accepts his affidavit as true in ruling on the motion summary judgment. *See Khungar*, 985 F.3d at 572-73.

In response to these complaints, Dr. Byrd had a medical appointment with Mr. Tomey on April 5, 2019, at 12:17 p.m. Dkt. 85-4 at 10; dkt. 85-5 at ¶ 7. He ordered a chest x-ray, which showed that Mr. Tomey had left lower lobe pneumonia and right lower lobe pneumonia. Dkt. 85-4 at 10, 14; Dkt. 85-5 at ¶ 8. Dr. Byrd noted that Mr. Tomey had a fever, was sweating profusely, and reported coughing up bloody phlegm. Dkt. 85-4 at 10. Mr. Tomey was receiving supplemental oxygen and was "requiring Oxygen at 4 L currently to maintain Oxygen Saturations at 94% or greater." *Id.*

Dr. Byrd ordered a nebulizer treatment, also known as DuoNeb X, which is commonly used to treat wheezing and shortness of breath. Dkt. 85-5 at ¶ 19. Dr. Byrd reported in the medical record for the April 5 appointment that the nebulizer treatment was ineffective. *See* dkt. 85-4 at 10 ("He has a fever, is diaphoretic, and quite SOB still despite DuoNeb treatment"). Dr. Byrd ordered additional periodic nebulizer treatments, which Mr. Tomey received in the infirmary. *Id.* at 10-14, 22-41.

According to Dr. Byrd, "pneumonia can be a serious illness, [but] it does not always require emergency treatment." *Id.* at ¶ 11. Dr. Byrd believes that symptoms such as chest pain, vomiting, or diarrhea can suggest more aggressive cases of pneumonia. *Id.* at ¶ 14. Mr. Tomey reported these very symptoms to Dr. Byrd at the appointment on April 5. Dkt. 99 at p. 5, ¶ 8.[2]

Dr. Byrd did not seek offsite treatment for Mr. Tomey or admit him to the prison infirmary. Dkt. 85-4 at 12. Instead, he ordered that Mr. Tomey receive supplemental oxygen in his cell and prescribed the antibiotic Levaquin. *Id.*

---

[2] The parties dispute whether Mr. Tomey reported these symptoms to Dr. Byrd on April 5, 2019. *Compare* dkt. 99 at p. 5, ¶ 8 ("I told Byrd that I was having chest and flank pain . . . nausea, and diarrhea more than usual") *with* dkt. 85-5 at ¶ 14 ("Mr. Tomey did not report chest pain, vomiting, or diarrhea."). Because Mr. Tomey is the non-moving party, the Court construes this factual dispute in his favor and accepts his affidavit as true in ruling on the motion for summary judgment. *See Khungar*, 985 F.3d at 572-73.

### F.  Worsening Condition – April 5-8, 2019

After the appointment with Dr. Byrd, Mr. Tomey's condition continued to deteriorate.

On April 6 at 9:00 a.m., he was having shortness of breath and "tenacious yellow spatum." Dkt. 85-4 at 37-39. He felt "less short of breath post [nebulizer] treatment." *Id.*

On April 6 at 1:23 p.m., the nurse observed wheezing and lung rales and noted that Mr. Tomey was "short of breath with speaking. Offender noted decrease shortness of breath/work post [nebulizer] treatment." *Id.* at 34-36.

On April 6 at 5:09 p.m., the nurse observed wheezing and lung rales. *Id.* at 31-33. She also noted "Offender complains of shortness of breath but has improved since [nebulizer] treatment. Encouraged offender to rest and cough and deep breathe." *Id.* at 33.

On April 7 at 9:13 a.m., Mr. Tomey told the nurse, "I was seeing things that weren't there throughout the night." *Id.* at 28. The nurse noted:

> Offender's overall appearance and color are worse than yesterday. Offender is pale with acrocyanosis [turning blue in the extremities]. Lung fields reveal rale on the anterior and posterior left side. Right lung fields are diminished. Offender continues to have increased work of breathing, states he is unable to use the restroom without becoming extremely winded. Peak flows done pre and post treatment. Encouraged offender to rest, cough, and deep breathe as much as possible and push oral fluid intake. **Will notify Dr of worsening condition**.

*Id.* at 30 (emphasis added).

On April 7 at 12:09 p.m., Mr. Tomey told the nurse, "I'm getting to the point where I'm hungry for air all the time." *Id.* at 25. The nurse noted:

> Offender appears to be worse than he was this morning in overall status. Increased work of breathing, complains of air hunger, decreased oxygen saturations, decreased peak flows, and lung sounds are more diminished than previous assessment. **Notified Dr. Byrd via phone of continued decline of condition**. Order rec'd [from Dr. Byrd] for Dexamethasone IM 12 mg [steroid injection], given to offender in glute.

*Id.* at 27 (emphasis added); *see also* dkt. 107 at ¶ 25-27 (regarding dexamethasone).

On April 7 at 5:16 p.m., Mr. Tomey told the nurse "I am not feeling any better since you gave me that shot at noon." Dkt. 85-4 at 22. The nurse noted, "Offender is flushed, diaphoretic [sweating profusely], and continues to complain of constant air hunger. Work of breathing is labored. Post [nebulizer] treatment work of breathing has slightly improved and offender states that he feels like he can move a little more air." *Id.* at 24.

On April 8 at 8:46 a.m., Mr. Tomey was taken to Terre Haute Regional Hospital by 911 ambulance, following an appointment with non-defendant Nurse Barbara Riggs. *Id.* at 15-19.

### G. Terre Haute Regional Hospital – April 8-18, 2019

On April 8, Mr. Tomey arrived at the emergency room at Terre Haute Regional Hospital in "severe respiratory distress, requiring intubation." Dkt. 99 at 92. He was "found to be tachycardic with atrial fibrillation rate of 160." *Id.* "Further imaging showed massive consolidation of left upper lobe, left lower lobe and portion of right middle and lower lung lobes." *Id.* Mr. Tomey was "influenza A positive." *Id.* He required "100% FiO2 [pure supplemental oxygen]." *Id.* Physicians observed bilateral "[c]oarse breath sounds." *Id.* at 93. He had an acute kidney injury that was likely caused by his atrial fibrillation, and severe sepsis. *Id.* at 93, 100-01. He was admitted to the hospital's intensive care unit. *Id.* at 101.

 On April 10, Mr. Tomey was no longer intubated, but he was still on a ventilator and was sedated. *Id.* at 103. He had a fever of 101 degrees. *Id.* His physician described his condition as "very tenuous on BiPAP. Desaturates quickly when taken off." *Id.* His cardiological condition was stable, and his physicians" primary concern was neurological. *Id.* Mr. Tomey was "only able to make unintelligible noises. His left arm [was] fully mobile as [were] both legs[,] but his right arm [was] completely flaccid . . . He [was] not withdrawing from pain at all." *Id.*

Mr. Tomey was discharged from Terre Haute Regional Hospital on April 18. *Id.* at 106.

### H.  Post-Hospital Condition

Mr. Tomey states that he has not fully recovered from this period of illness. Dkt. 99 at p.

7, ¶ 15. He receives three breathing treatments every day, whereas before his hospitalization, he

only had an emergency inhaler that he rarely used. *Id.* He is unable to do any strenuous activity.

*Id.* Before his hospitalization, he "could go out and run on the basketball court for several games

in a row." *Id.* But now, he cannot exercise or play basketball at all. *Id.* The trauma from this

incident has impacted his mental health, too. *Id.* He has panic attacks when he can't catch his

breath, and he has nightmares of being back in the hospital. *Id.*

### I.  Wexford's Efforts to Cut Costs

When Wexford sought the medical services contract from the Indiana Department of

Correction, cutting costs was at the heart of its Technical Proposal. For example, Wexford stated

that it offers "comprehensive utilization management capable of generating literally millions of

dollars in cost savings." Dkt. 99 at 184. Wexford provided the following chart demonstrating its

ability to cut costs for a large state prison system:



**Figure 1:** Cost savings achieved for a large state prison system by Wexford's telehealth program
(through August 2016)

11

*Id.* at 186. The company promised that if given the contract, "Wexford will make every effort to minimize offsite clinic trips." *Id.* at 191.

After Wexford won the contract, its regional medical director, Dr. Michael Mitcheff, tried to cut costs at Wabash Valley Correctional Facility by terminating prescriptions in an across-the-board fashion. On January 22, 2019, Dr. Mitcheff wrote the following email to Dr. Byrd and Dr. Rajoli:

> Sam/Naveen
> Please review. My biggest concern with WBVF is you have the highest percentage of patients on meds. (67%)
> Our average is about 50% (which I still think is high) There is a lot of polypharmacy and a lot of it related to convenience items.
> Please keep this in mind when prescribing.
> Have a great week
> Mike

*Id.* at 169.

On May 13, 2019, another Wexford official wrote the following email, which was sent to many employees including Dr. Byrd, Dr. Rajoli, and Dr. Mitcheff:

> Team,
> Above is the polypharmacy report for April redacted by me to include only 10 or more medications. It shows patients for the month of April on 10 or more drugs.
> A brief summary of the highest # of patients is below:
>    1)  Byrd 80
>    2)  Marthakis 52
>    3)  Talbot 35
>    4)  Ippel 24
>    5)  Mershon 23

*Id.* at 170.

On May 17, 2019, Dr. Byrd sent an email to a prison official order that all prescriptions for certain medications not be renewed:

> Lesa,
> No renewal of creams/lotions, Pepcid, Zantac, APAP, Mobic, Naproxen, allergy meds, or coal tar shampoos. Such treatments available off of commissary and will need to be readdressed individually with exam and commissary reviews. Thanks.

*Id.* at 171.

Dr. Mitcheff was cc'd on this email, and responded:

> Agree with no automatic renewals. Each case needs review by the clinician and approved.

> Stool softeners, antidiarrheal agents, "chronic pain meds" such as Trileptal, Lamictal and gabapentin should be used sparingly

> Below are [*sic*] a list of opportunities for just one month. Certainly some may be very appropriate.

> I have kept Kim and Amy out of the loop I think. Wabash is BY FAR, the number one outlier for FER's, has the highest percentage of patients on medications (Just shy of 70%!) and highest in polypharmacy. There needs to be a change in culture and we need to work on "deprescribing" when safe to do so.

> This creates a major burden operationally, volume drives cost and the way its been done created a culture of the inmates getting what they want and not what they need. I get complaints when your patients get transferred to other facilities. Our goal is not to make people pain free and perfect but to treat serious medical conditions. Focus always should be on lifestyle modification including weight loss first.

*Id.* at 173.

## III. DISCUSSION

### A. Eighth Amendment Standard

Because Mr. Tomey is a convicted prisoner, his medical treatment is evaluated under standards established by the Eighth Amendment's proscription against the imposition of cruel and unusual punishment. *See Helling v. McKinney*, 509 U.S. 25, 31 (1993) ("[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment."). The Eighth Amendment "protects prisoners from prison conditions that

cause the wanton and unnecessary infliction of pain." *Pyles v. Fahim*, 771 F.3d 403, 408 (7th Cir. 2014).

"To determine if the Eighth Amendment has been violated in the prison medical context, [the Court] perform[s] a two-step analysis, first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual defendant was deliberately indifferent to that condition." *Petties v. Carter*, 836 F.3d 772, 727-728 (7th Cir. 2016) (en banc).

"A prison official is deliberately indifferent only if he 'knows of and disregards an excessive risk to inmate health or safety.'" *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016) (quoting *Farmer*, 511 U.S. at 837). This is a subjective test: "[t]he defendant must know of facts from which he could infer that a substantial risk of serious harm exists, and he must actually draw the inference." *Id.*; *Petties*, 836 F.3d at 728. A court should "look at the totality of an inmate's medical care when considering whether that care evidences deliberate indifference to serious medical needs." *Petties*, 836 F.3d at 728.

### B. Analysis

#### 1. Dr. Rajoli

Dr. Rajoli argues that Mr. Tomey was not suffering from an objectively serious medical condition during the appointment on March 27, 2019. Dkt. 86 at 20-21. He argues that the only symptoms Mr. Tomey suffered from at that time were phlegm and shortness of breath, which may have resulted from COPD rather than acute medical distress. *Id.* He points to the results of the PFT, which he argues were normal, and claims that Mr. Tomey had "normal air flow and a normal pulse ox." *Id.* at 21.

The Court finds this argument unpersuasive. First, by March 27, Mr. Tomey's symptoms were much worse than the baseline symptoms of his chronic conditions. His mucus had become hard, "like you would get off a scab," and he was "coughing up blood." Dkt. 85-1 at 57, 141. He also had trouble breathing, chest pain, and lower back pain. *Id.*; dkt. 99 at p. 5, ¶ 5.

Second, there is no evidence that the spirometer used to perform the PFT was reliable, as the machine had not been checked for accuracy for about two months before the test was performed—a fact Dr. Rajoli would have known by reviewing the results of the PFT. *See* dkt. 85-4 at 2. Further, the results of the PFT are not dispositive of Mr. Tomey's condition at his appointment six days later, given that his condition progressively deteriorated over a relatively brief period of time. *See generally*, dkt. 85-4 at 3-41.

Third, while Mr. Tomey is not a medical expert, he can testify about the subjective experience of his own illness. *See* Fed. R. Evid. 701. Mr. Tomey states that his health began to deteriorate in February 2019 and continued to deteriorate until April 8, 2019, at which point (as shown by objective medical evidence) he was close to death and was transported to the intensive care unit of an outside hospital. *See* dkt. 99 at 4-8, 92-106. Given this timeline, a reasonable jury could conclude that Mr. Tomey was already suffering from an objectively serious medical condition when he met with Dr. Rajoli on March 27.

Finally, Mr. Tomey has multiple serious chronic medical conditions, including COPD and non-Hodgkin's lymphoma. *See generally* dkt. 85-4. Dr. Rajoli's argument that Mr. Tomey's March 27 symptoms may have arisen from these chronic conditions, rather than from acute distress, ignores the obvious fact that chronically ill patients need more attention, not less.

Dr. Rajoli also argues that he was not deliberately indifferent to Mr. Tomey's medical need because his treatment decisions were based on his professional medical judgment, which were not

"so far afield of accepted pro[f]essional standards as to raise the inference that [they were] not actually based on medical judgment." Dkt. 86 at 21-22 (quoting *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 241 (7th Cir 2021)). He also argues that Mr. Tomey is "not entitled to direct his own medical care." *Id.* (citing *Harper v. Santos*, 847 F.3d 923, 927 (7th Cir. 2017)).

These arguments ignore evidence in the record. According to Mr. Tomey, Dr. Rajoli did not treat Mr. Tomey's medical conditions at all. Instead, when Mr. Tomey asked him whether the spirometer used to perform the PFT was reliable, Dr. Rajoli said, "Shut up. I ask the questions, not you." *Id.* at pp. 4-5, ¶ 4. Then, he refused to discuss any of Mr. Tomey's symptoms and kept cutting Mr. Tomey off before he could explain any of his medical issues in detail. *Id.* He did not perform a physical examination, listen to Mr. Tomey's lungs, or discuss the possibility of using medication to manage the production of green mucus, even though Mr. Tomey was visibly struggling to breathe and told Dr. Rajoli about his chest and low back pain. *Id.* at p. 4-5, ¶¶ 4-5, 7. Dr. Rajoli also declined to record a complete list of Mr. Tomey's symptoms in the medical record for that appointment. *Compare* dkt. 85-4 at 3-6 (medical record) *with* dkt. 99 at p. 5, ¶ 5 (Tomey affidavit).

If a jury credits Mr. Tomey's description about what occurred during his appointment with Dr. Rajoli on March 27, it could reasonably conclude that Dr. Rajoli recklessly ignored the substantial risk of serious harm created by Mr. Tomey's objectively serious medical condition by failing to provide him with any meaningful medical attention or treatment. Accordingly, Dr. Rajoli's motion for summary judgment is **DENIED**.

### 2.  Dr. Byrd

Dr. Byrd concedes that Mr. Tomey suffered from an objectively serious medical condition, but argues that he was not subjectively deliberately to his medical needs. Dkt. 86 at 21-22.

In support of this argument, he points to the tests and treatments he ordered for Mr. Tomey's pneumonia on April 5, and the steroid he prescribed when his condition did not improve. *Id.*

A reasonable jury could find that Dr. Byrd was deliberately indifferent in three ways. First, he provided no medical care at all for Mr. Tomey's atrial fibrillation or kidney failure. In his affidavit, Dr. Byrd admits that "decreased urine output" is a common symptom associated with a kidney injury. Dkt. 107 at ¶ 33. Flank pain is also a common symptom of kidney injury.[3] Chest pain and shortness of breath are common symptoms of atrial fibrillation.[4] Mr. Tomey reported all these symptoms to Dr. Byrd on April 5, but Dr. Byrd did not provide any treatment or perform any diagnostic tests with respect to these conditions. Dkt. 99 at p. 5, ¶ 8; dkt. 85-4 at 10-13. Dr. Byrd claims that he did not treat Mr. Tomey for atrial fibrillation or kidney disease because Mr. Tomey did not tell him about his chest pain, flank pain, or inability to urinate, *see* dkt. 107 at ¶¶ 32-33, but this is a factual dispute that must be decided at trial, not summary judgment. *See Khungar*, 985 F.3d at 572-73.

Second, Dr. Byrd failed to order an emergency transport for Mr. Tomey or take other more aggressive steps to treat his pneumonia. Dr. Byrd admits that symptoms such as chest pain, vomiting, or diarrhea can suggest more aggressive cases of pneumonia. Dkt. 107 at ¶ 14. Mr. Tomey reported these very symptoms to Dr. Byrd at the appointment on April 5. Dkt. 99 at p. 5, ¶ 8. Dr. Byrd disputes that assertion, *see* dkt. 107 at ¶ 14, but this is another factual dispute that must be decided at trial, not summary judgment. *See Khungar*, 985 F.3d at 572-73.

---

[3] https://www.mountsinai.org/health-library/symptoms/flank-pain (lasted visited April 13, 2023).

[4] https://www.nhs.uk/conditions/atrial-fibrillation/symptoms/#:~:text=The%20way%20the%20heart%20beats,pain%20that%20comes%20and%20goes (last visited April 13, 2023).

Third, Dr. Byrd failed to order an emergency transport for Mr. Tomey and persisted in ineffective treatments while his condition deteriorated between April 5 to April 8. *See Greeno v. Daley*, 414 F.3d 645, 655 (7th Cir. 2005) (holding there was a genuine dispute of fact precluding summary judgment where a prison physician refused to refer prisoner to a specialist or authorize an endoscopy for two days while the prisoner's condition deteriorated and onsite treatments were ineffective).

There is evidence that Dr. Byrd knew that Mr. Tomey had an aggressive form of pneumonia and symptoms of atrial fibrillation and kidney injury for which he was receiving no treatment. He observed during the April 5 appointment that the nebulizer treatment was ineffective. *See* dkt. 85-4 at 10 ("He has a fever, is diaphoretic, and quite SOB still despite DuoNeb treatment"). He also knew that Mr. Tomey's symptoms were getting worse, as he received updates about his worsening condition from the nursing staff. Dkt. 85-4 at 27, 30.

Based on this information, it should have been obvious to Dr. Byrd that the prison was not equipped to manage Mr. Tomey's condition on site. Indeed, it seems that the prison did not even have a doctor physically present to monitor Mr. Tomey's condition, and the nursing staff only saw Mr. Tomey periodically because Dr. Byrd refused to admit him to the infirmary. *See* dkt. 85-4 at 12 ("infirmary admit not felt necessary at this time"); dkt. 85-3 at 15 (Byrd interrogatory response) ("I do not believe I was working at Wabash Valley Correctional Facility on April 6 or April 7, 2019").

Dr. Byrd claims that he was not provided all of the information included on the April 7 nursing note and "does not recall" any reports of air hunger. Dkt. 85-3 at 107 at ¶ 24. At most, discrepancies between Dr. Byrd's recollection of what he was told by the nursing staff, and the

18

medical records themselves, in which the nurse recorded informing Dr. Byrd about Mr. Tomey's condition, may create a dispute of fact to be resolved at trial.

In sum, there is evidence that Dr. Byrd failed to treat Mr. Tomey for atrial fibrillation and kidney disease, that he failed to order a transport or take more aggressive action on April 5 in response to Mr. Tomey's aggressive pneumonia, and that Dr. Byrd persisted in ordering ineffective onsite treatment from April 5 to April 8. Accordingly,  Dr. Byrd's motion for summary judgment is **DENIED**.

### 3. Wexford

Private corporations acting under color of state law—like Wexford—are treated as municipalities for purposes of Section 1983 and can be sued when their actions violate the Constitution. *Dean*, 18 F.4th at 235 (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)). The critical question under *Monell* is whether a corporate policy or custom causes the harm as opposed to whether the harm simply resulted from one of the corporation's agents. *Glisson v. Ind. Dep't of Cor.*, 849 F.3d 372, 379 (7th Cir. 2017); *First Midwest Bank Guardian of Estate of LaPorta v. City of Chicago*, 988 F.3d 978, 986 (7th Cir. 2021) ("[T]o prevail on a § 1983 claim against a [corporation] under *Monell*, a plaintiff must challenge conduct that is properly attributable to the municipality itself.").

To make out a *Monell* claim, Mr. Tomey must show three things. First, he must show a deprivation of a federal right traceable to some corporate action. *Dean*, 18 F.4th at 235. There are at least three types of corporate action can support corporate liability: (1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; (3) an allegation that the constitutional injury was caused by a person with final policymaking authority. *First Midwest Bank*, 988 F.3d at

986; *Reck*, 27 F.4th at 488 ("Either the content of an official policy, a decision by a final decisionmaker, or evidence of custom will suffice."). Second, he must show the policy or custom demonstrates corporate fault, *i.e.*, deliberate indifference. *Dean*, 18 F.4th at 235. Finally, he must show the policy or custom caused the violation of his Constitutional rights. *Id.* "To satisfy the standard, [Mr. Tomey] must show a direct causal link between the challenged municipal action and the violation of his constitutional rights." *First Midwest Bank*, 988 F.3d at 987.

In this case, the evidence supports a reasonable conclusion that Wexford maintains a policy or custom of applying cost-saving measures bluntly, to the detriment of patient care. Wexford's ability to "generat[e] literally millions of dollars in cost savings" and "make every effort to minimize offsite clinic trips" was at the heart of its Technical Proposal when it sought the medical services contract from the Indiana Department of Correction. Dkt. 99 at 184, 191. Other cases in this District have discussed the Technical Proposal and explained that it contains express language of prioritizing reducing costs. *See Toran v. Wexford Health Sources, Inc.*, No. 2:19-cv-00066-JMS-DLP, 2021 WL 396618, at *4 (S.D. Ind. Feb. 4, 2021) (explaining Wexford's Technical Proposal states, "Wexford's goal is to help the IDOC to avoid offender transport and offsite security costs" and "Wexford will make every effort to minimize offsite clinic trips"); *id.* at 6 (denying Wexford's motion for summary judgment based on the Technical Proposal); *Zamarron v. Wexford Health Sources, Inc.*, No. 2:21-cv-00098-JMS-MKK, 2023 WL 2349381, at *2 (S.D. Ind. Mar. 3, 2023) (same); *id.* at 8 (denying Wexford's motion for summary judgment based on the Technical Proposal). Because Mr. Tomey's medical treatment involves delays and denials for offsite care, Wexford's Technical Proposal is directly material to his *Monell* claim.

Also, Dr. Mitcheff instructed Wexford's Indiana physicians to make across-the-board terminations to prescriptions, even though these terminations would mean that prisoners would

experience more pain and worse health. *Id.* 173. Dr. Byrd himself ordered that prescriptions for about a dozen medications be terminated across-the-board to save costs. *Id.* at 171.

As to direct cause, Wexford argues that Mr. Tomey "has no evidence in this case to support a finding that, had he been sent for off-site care earlier, his pneumonia would have progressed differently." Dkt. 86. This argument ignores the fact that Mr. Tomey also suffered from atrial fibrillation and kidney failure—conditions for which he received no medical care whatsoever before he was transported to Terre Haute Regional Hospital. Further, the fact that his health declined steadily while he remained at the prison, to the point where he was near death and needed to be taken to an intensive care unit, and only improved during his 10-day hospital stay, is evidence that the delay in offsite care negatively affected the course of his multiple illnesses. *See Greeno*, 414 F.3d at 655 ("The fact that the endoscopy, when finally performed, did lead to successful treatment makes it all the more obvious that Dr. Daley and the other medical staff should have responded earlier to Greeno's requests for further testing.")

As explained above, it was obvious that Mr. Tomey's life-threatening medical condition could not be managed on site, yet Dr. Byrd refused to order his transport to an offsite hospital. A jury could reasonably conclude that Dr. Byrd's refusal was part of Wexford's policy or custom of sacrificing patient care to cut costs, and that this refusal prolonged and exacerbated Mr. Tomey's pain. Accordingly, Wexford's motion for summary judgment is **DENIED**.

## IV. Conclusion

The defendants' motion for summary judgment, dkt. [85], is **Denied**. Mr. Tomey's motion for judicial notice of certain websites, dkt. [112], is **Denied without Prejudice**, as the Court did not rely on those websites in ruling on the motion for summary judgment.

21

The defendants **ARE ORDERED to** file a Notice Regarding Settlement Conference within **14 DAYS OF THE ISSUANCE OF THIS ORDER**. That Notice shall state whether they believe a settlement conference with the Magistrate Judge would be appropriate at this time.

The **CLERK IS DIRECTED** to send Mr. Tomey a motion for assistance recruiting counsel form with his copy of this Order. Given the challenges of late-stage litigation, such as trial and settlement conferences, the Court encourages Mr. Tomey to use this form if he chooses to file a motion for assistance recruiting counsel.

**IT IS SO ORDERED**.

Date: 4/20/2023

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

Distribution:

BRADLEY TOMEY
896016
WABASH VALLEY - CF
WABASH VALLEY CORRECTIONAL FACILITY - Inmate Mail/Parcels
Electronic Service Participant – Court Only

All Electronically Registered Counsel